GASKINS (Pro Tempore), J.
Before the court is the appeal of D.M., a juvenile adjudicated delinquent for the armed robbery of James Peaden ("Mr. Peaden"). D.M. specifies three errors: (1) there was insufficient evidence for his conviction; (2) the lower court erred in refusing to grant his motion to suppress the photographic lineup identification; and (3) the trial court erred in refusing to suppress the in-court identification. For the reasons stated hereinafter, we affirm and remand with instructions.
FACTS AND PROCEDURAL HISTORY
On February 2, 2017, Mr. Peaden ate lunch at Som-T-Eat, a restaurant in Claiborne *136 Parish, Louisiana. When he finished eating, he exited the restaurant and walked to his truck, whereupon he discovered D.M. lying in the truck's bed against the cab. Mr. Peaden recognized D.M.'s face from "the day or the day before" when the pair shared a table at the same restaurant. Mr. Peaden offered to give him a ride and invited him to ride in the cab of the truck. D.M. asked for a ride to Homer Plaza, and initially declined to ride in the cab. During the trip, D.M. tapped on the window and indicated that he wanted to ride in the cab; Mr. Peaden obliged. After riding in the cab a while, D.M. instructed Mr. Peaden to "pull over," and Mr. Peaden did so. Thereupon, Mr. Peaden realized that D.M. was pointing a handgun at him. D.M. ordered Mr. Peaden to get out of the vehicle. Both of them exited the truck and walked in front of it. With the pistol pointed at Mr. Peaden's head, D.M. said "give me all your money." Mr. Peaden complied, giving D.M. approximately $27. Thereafter, D.M. got in the truck and "kept revving the motor a little bit like he couldn't put it in gear." He then exited the truck, again pointing the gun at Mr. Peaden's head, and demanded Mr. Peaden's cell phone. Mr. Peaden replied that he had no cell phone. D.M. pulled a ski mask down over his face, removed it after approximately 10 seconds, and then got back in the truck. He drove away, leaving Mr. Peaden, a 79-year-old, on foot in a rural area.
Mr. Peaden began walking to the Hill Farm Research Station, which was roughly a mile from where D.M. left him. He hitchhiked part of the way and called the sheriff's department upon arrival. Captain Jimmy Brown responded to Mr. Peaden's call. Mr. Peaden was still too upset to write at this point; therefore, he instead dictated a statement to Captain Brown, who handwrote Mr. Peaden's statement and had him sign it. This written statement, according to Captain Brown's testimony, contained "the entirety" of what Mr. Peaden told him that day.
Captain Brown testified that Mr. Peaden described the perpetrator as a black male with a small mustache, approximately 5'8", wearing blue jeans, a light-colored shirt, and a jacket. He also testified that Mr. Peaden said the gun was a small revolver, possibly a .32-caliber. Mr. Peaden did not mention to Captain Brown that he and D.M. had shared a table at the restaurant; however, Captain Brown did not recall ever asking Mr. Peaden if he knew the perpetrator.[1]
Detective Randy Smith was another officer involved in the investigation. He heard a description of the perpetrator over the police radio, and upon learning that the incident began at Som-T-Eat restaurant, suspected that the perpetrator was D.M. Detective Smith explained that he knew that D.M.'s parents own the restaurant and that D.M.'s family lives next door to it.
Detective Smith submitted a request for a photographic lineup to the Louisiana State Police Investigation Unit and included D.M.'s name and Louisiana identification number in the submission. The Louisiana State Police Investigation Unit sent a computer-generated six-person photographic lineup to Detective Smith, which included D.M. This lineup was admitted into evidence.
On the night of February 3, 2017, Detective Smith and another officer went to Mr. Peaden's residence and presented him *137 with the photographic lineup. Mr. Peaden picked photograph number three, i.e. , that of D.M. However, before choosing D.M., he eliminated four others in the lineup, then looked back and forth between D.M.'s picture and one other, then chose D.M.
On February 9, 2017, D.M. was charged by petition in Juvenile Court with the armed robbery of Mr. Peaden in violation of La. R. S. 14:64. On March 20, 2017, D. M. filed a motion to suppress the photographic lineup as unduly suggestive; the trial court referred the motion to the merits. On May 10, 2017, D.M.'s adjudication hearing was held. That day, Mr. Peaden identified D.M. in open court as the young man who robbed him.
In an attempt to establish an alibi, D.M. called several witnesses at trial. D.M.'s brother, Josh Ealy, testified that he and D.M. were at Jeremy Washington's house during the time frame within which the robbery took place. However, Jeremy Washington and his mother (both of whom were called by the prosecution) told police that D.M. had not been at their house on the day of the robbery; they acknowledged and affirmed these statements at trial. Furthermore, Jeremy Washington told police that DM's brother had called and told Jeremy to tell the police (if they questioned him) that DM had been at Jeremy's house the day the robbery.
D.M. called his uncles, Eddie Walker and Isaac Walker, and also Earl Amos. The uncles testified that while riding in the truck together on the day of the robbery, they saw an unknown pedestrian in the Athens area. One uncle testified that he did not see the pedestrian's face, while the other testified that he did, and that it was an unfamiliar male. Both uncles testified that this person was wearing a hoodie. Contrary to the uncles' testimony, Earl Amos identified this person as D.M. However, Amos testified that he could not remember the day this happened.
Verlene Manuel and Alton Manuel, D.M.'s mother and father, testified that D.M. occasionally worked at the restaurant and had served Mr. Peaden food before. They also recounted that on the day of the robbery, an unfamiliar young African-American male came to the restaurant and has not been seen since. D.M.'s mother added that she did not recall D.M. leaving the house on the day of the robbery.
The trial court, noting that Mr. Peaden's testimony was "very persuasive," adjudicated D.M. delinquent for the armed robbery of Mr. Peaden. On June 9, 2017, the trial court ordered that D.M. serve two years in a secure facility without benefit of probation, parole, or suspension of sentence.
DISCUSSION
Sufficiency of the evidence
"In order for the court to adjudicate a child delinquent, the state must prove beyond a reasonable doubt that the child committed a delinquent act alleged in the petition." La. Ch. C. art. 883. In a juvenile case, the reviewing court is constitutionally compelled to review both facts and law. La. Const. art. V, § 10 (A) and (B). "However, the reviewing court must recognize that the juvenile judge observed the conduct and demeanor of the witnesses and was in the best position to determine credibility and weigh the evidence." State In Interest of D.R. , 50,594 (La. App. 2 Cir. 2/24/16), 188 So.3d 1116, 1120. "Therefore, this Court grants great deference to the juvenile court's factual findings and credibility determinations and assessment of the weight of particular testimony." Id. The standard of review in Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L. Ed. 2d 560 (1979) applies to juvenile delinquency *138 adjudicatory hearings. Additionally, our state constitution further mandates that we determine, after reviewing the record evidence, whether the juvenile court was clearly wrong in its fact findings. Id.
When the defendant challenges the sufficiency of the evidence on which his conviction is based, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Lynch , 436 So.2d 567 (La. 1983). "This standard, now legislatively embodied in La. C. Cr. P. art. 821,[2] does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder." State In Interest of D.R., supra, at 1120. Furthermore, "[t]he appellate court does not assess the credibility of witnesses or reweigh evidence." Id. ; State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court must accord great deference to the fact-finder's decision to accept or reject the testimony of a witness in whole or in part. State v. Eason , 43,788 (La. App. 2 Cir. 2/25/09), 3 So.3d 685, writ denied , 09-0725 (La. 12/11/09), 23 So.3d 913.
"Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency." State In Interest of D.R., supra, at 1120. One witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion, provided it does not bear internal contradiction or irreconcilably conflict with physical evidence. Id.
La. R.S. 14:64 defines armed robbery:
Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
It is undisputed that someone robbed Mr. Peaden at gunpoint. The sole factual issue is whether Mr. Peaden's identification of D.M. constitutes sufficient evidence. We hold that it does.
A rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could conclude that Mr. Peaden's identification of D.M. was proved beyond reasonable doubt. Mr. Peaden's familiarity with D.M.'s face-from sharing a table at the same restaurant a day or two before the robbery-greatly bolsters the reliability of his identification of D.M. as the perpetrator. Furthermore, Mr. Peaden's description of the events leading up to and during the robbery indicates that he had an adequate opportunity to view D.M.'s face and that his attention was, at least for enough of that time period, focused on D.M. He saw and recognized D.M.'s face when he first approached his truck to leave the restaurant. Mr. Peaden saw D.M.'s face again when he entered the truck, and when D.M. ordered him to stop the truck. When D.M. took Mr. Peaden's cash, they were only an arm's length apart and D.M.'s face was uncovered. D.M. had his face covered for only a short amount of time when he demanded Mr. Peaden's cell phone. Accordingly, this assignment of error lacks merit.
*139 Nonetheless, we address each of the defense's claimed deficiencies in Mr. Peaden's testimony identifying D.M. as the perpetrator. First, at trial, Mr. Peaden testified that he had eaten lunch at the same table as D.M. "the day or the day before" the armed robbery. This was also at Som-T-Eat, the restaurant at which the February 2, 2017, encounter between Mr. Peaden and the perpetrator began. Defense counsel attempts to make much of the fact that Mr. Peaden did not recount this fact in his initial statement to Captain Brown. However, Captain Brown testified that he did not remember asking Mr. Peaden if he had ever seen the perpetrator before the day of the robbery. Furthermore, it is understandable that it did not occur to Mr. Peaden to mention this fact in the initial statement because he was still so upset from the robbery that he was unable to write.
Second, the defense argues that Mr. Peaden initially described the perpetrator as being about 5'8" tall, whereas D.M. is actually 6 feet tall. A commonsense reading of the record suggests that Mr. Peaden's statement that the perpetrator was roughly 5'8" tall was merely a visual estimate.[3] Furthermore, Mr. Peaden's testimony bears no indication that Mr. Peaden and the perpetrator stood near each other at any time other than when the perpetrator was pointing a handgun at Mr. Peaden's head.
Third, the defense argues that Mr. Peaden changed the description of the weapon from a "small revolver, possibly a .32 caliber" to a "small pistol between a .25 and .32 caliber."[4] Defense counsel had the opportunity to question Mr. Peaden about this during cross-examination, but did not do so. Nothing in evidence indicates that Mr. Peaden did not use the words "pistol" and "revolver" interchangeably.
Admissibility of photographic lineup identification
The defense filed a motion to suppress the photographic lineup from which Mr. Peaden initially identified D.M. after the incident. The lineup was computer-generated by the Louisiana State Police Investigation Unit based upon D.M.'s Louisiana identification number.
"A trial court's decision to deny a motion to suppress is afforded great weight and will not be set aside unless the preponderance of the evidence clearly favors suppression." State v. Marshall , 46,457 (La. App. 2 Cir. 8/10/11), 70 So.3d 1106. "This court reviews a district court's ruling on a motion to suppress under the manifest error standard for factual determinations...while applying a de novo review to findings of law." Id.
In Neil v. Biggers , 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the United States Supreme Court held that an accused may not obtain exclusion of a pretrial identification merely because it is suggestive. Instead, exclusion requires the defendant to prove a substantial likelihood of misidentification, as determined under the totality of the circumstances. See also, State v. Nicholas , 397 So.2d 1308, 1316 (La. 1981). The factors to be considered in evaluating the likelihood of misidentification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention;
*140 (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. Id.
State v. Evans , 463 So.2d 673 (La. App. 4 Cir. 1985), held that where an identification witness had been acquainted with the defendant prior to the incident, and identified the defendant by name prior to photographic identification, the fact that only one photograph, i.e. , that of the defendant, was shown to the witness did not render the pretrial identification inadmissible. The Evans court described the facts of the antecedent acquaintance as follows:
Coleman [the identification witness] also stated that he recognized Evans [the defendant] when he entered the hotel lobby that morning because Evans occasionally visited the lobby of the French Market Inn while on duty as a security guard at the Jackson Brewery. Therefore, because Coleman was acquainted with Evans prior to this incident, the showing of only one photograph to corroborate Coleman's identification of the perpetrator of this crime was not error. This assignment of error is without merit.
Id. at 677.
Mr. Peaden's trial testimony indicates that, prior to the robbery, he was familiar enough with the appearance of D.M. to recognize him at the beginning of the encounter which culminated in the armed robbery. Mr. Peaden's identification of D.M. was sufficiently reliable because of their prior acquaintance. For this reason alone, this assignment of error lacks merit.
However, we also find a second reason that this assignment lacks error: the photographic lineup was not unduly suggestive.
"There are no exact detailed criteria for a legitimate photographic lineup... [T]he fundamental rule is that each case must be considered on a careful analysis of its own facts." State v. Tonubbee , 420 So.2d 126, 130 (La. 1982). The Louisiana Supreme Court has, however, given the following guidance:
A line-up is unduly suggestive if a sufficient resemblance of characteristics and features of the persons in the line-up e.g. build, hair, facial hair and complexion, does not exist to reasonably test the identification. If only one person in the line-up has the characteristics of the perpetrator, the witness' attention will be focused on that person.
State v. Williams , 402 So.2d 678, 679 (La. 1981) (internal citations omitted).
In this case, the lineup consists of head (face) and neck pictures of D.M. and five other apparently young black males. The others have similar eye color, hair color, and skin tone to that of D.M.; all of the others have hairstyles at least similar to D.M.'s; and four of the five others' hairstyles are virtually identical to D.M.'s.
Accordingly, we hold that the photographic lineup was not unduly suggestive. The others in the lineup were similar enough to D.M. to reasonably test Mr. Peaden's ability to identify D.M. as the perpetrator.
Because the photographic lineup identification did not bear a substantial likelihood of misidentification, the in-court identification could not have been tainted by it. Therefore, the trial court's denial of the motion to suppress the in-court identification was not error.
Error patent
Although the Louisiana Children's Code is silent as to whether a juvenile proceeding warrants an error patent review, the Children's Code provides that *141 where it is silent, the provisions of the Louisiana Code of Criminal Procedure apply. La. Ch. C. art. 104 ; see also La. C. Cr. P. art. 920. State v. In Interest of K.S. , 50,593 (La. App. 2 Cir. 2/24/16), 188 So.3d 1113.
The Louisiana Children's Code provides no procedures regarding post-conviction relief-therefore, the provisions of the Code of Criminal Procedure are applicable. La. C. Cr. P. art. 930.8(C) states, in part, that "[a]t the time of sentencing, the trial court shall inform the defendant of the prescriptive period for post-conviction relief either verbally or in writing." The record demonstrates that, at the disposition hearing on June 9, 2017, the trial court advised D.M. that "[y]ou have two years from the date this adjudication and disposition become final to file for any kind of relief."
"If the trial court fails to advise, or provides an incomplete advisal, pursuant to La. C. Cr. P. art. 930.8, the appellate court may correct error by informing the defendant of the applicable prescriptive period for post-conviction relief." State in Interest of B.D. , 13-760 (La. App. 5 Cir. 4/23/14), 140 So.3d 308. To the extent that the trial court's advisement was unclear, this Court advises D.M. that, pursuant to La. C. Cr. P. art. 930.8, no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the adjudication of delinquency and disposition have become final under the provisions of La. C. Cr. P. arts. 914 or 922.
We note that, although the trial court ordered that D.M. serve his two years in secure placement , the minutes do not reflect this.
CONCLUSION
The trial court's decision is AFFIRMED. We REMAND with instructions for the trial court to amend the minutes to reflect that the two years is to be served in secure placement.
ADJUDICATION AFFIRMED; CASE REMANDED FOR AMENDMENT OF COURT MINUTES.

Mr. Peaden's testimony seems to indicate that he later informed the police that, at the beginning of the encounter culminating in the armed robbery, he had recognized D.M. from earlier sharing a table with him at the restaurant.

"Where procedures are not provided in the Children's Code, or otherwise by law, the court shall proceed in accordance with the Code of Criminal Procedure in a delinquency proceeding. La. Ch. C. arts. 104(1) and 803."

We note that D.M.'s own mother initially testified that he is "about 5'9" or 6 foot" in height.

The former description comes from Capt. Brown's testimony regarding Mr. Peaden's initial statement, which Capt. Brown testified that he wrote down "verbatim." The latter description comes from Mr. Peaden's trial testimony.